**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Internet Incorporated,

                    Plaintiff,              Civ. No. 05-317 (RHK/AJB)
                                            **MEMORANDUM OPINION**
                                            **AND ORDER**
v.

Tensar Polytechnologies, Inc., and
The Tensar Corporation,

                    Defendants.

---

David A. Allgeyer and Marc A. Al, Lindquist & Vennum P.L.L.P., Minneapolis, Minnesota,
for Plaintiff.

J Jackson and Thomas Jancik, Dorsey & Whitney LLP, Minneapolis, Minnesota, for
Defendants.

---

**Introduction**

        Before the Court is Plaintiff Internet Incorporated's ("Internet") Motion for a

Preliminary Injunction.  Internet seeks to enjoin Defendants from misappropriating

Internet's trade secrets in violation of the Minnesota Uniform Trade Secret Act.  It alleges

that a former employee provided Defendants with information enabling them to effectively

compete against it in a particular market.  Defendants argue that Internet has failed to

demonstrate that it is entitled to preliminary injunctive relief under the Dataphase analysis.

For the reasons set forth below, the Court will deny Internet's Motion.

**Background**

**The Parties and the Industry**

Internet is a Minnesota corporation which has been in operation since 1981 and currently employs 30 people.  It sells a variety of plastic netting and precision-mesh materials.  The materials have thousands of applications, ranging from molecular research sieves to deer fencing and HEPA filters, and are sold to hundreds of Internet's clients ranging from very large to much smaller companies.  About half of Internet's business is in what is broadly described as the filtration market—generally involving the production of systems used to purify air, liquids, and solids.

Internet specializes in two aspects of the filtration market: first, it purchases large quantities of materials and resells those materials to its customers out of inventory when needed; and second, it "coverts" raw materials from standard formats into custom products in order to meet specific customer needs.

Defendant Tensar Polytechnologies, Inc., is a wholly-owned subsidiary of Defendant The Tensar Corporation (collectively "Tensar"), and is a supplier of extruded plastic nets, which are used for a range of applications in varying markets.  The nets are manufactured by a sister company, The Tensar Corporation (Georgia)[1], also a wholly-owned subsidiary of The Tensar Corporation.  Tensar contends that, in connection with its production of netting,

---

[1]The Tensar Corporation (Georgia) is not a defendant in the instant action.

it has been a participant in the filtration market since the mid-1990's.[2]  (Pettit Dep. Tr. at

20.)  John Pettit, Tensar Polytechnologies's Vice-President of Sales, is "solely responsible

for the sales activities [the company.]"  (Pettit Decl. ¶ 4.)

In approximately 1996, Tensar arranged for Internet to perform all of its converting

services, so that it could focus more on manufacturing its netting products.  (Pettit Dep. Tr.

at 23-29.)  As Tensar's converter, Internet receives a large roll of netting manufactured and

supplied by the various Tensar companies and, by either "slitting it, rewinding it, dye cutting

it, [or] doing whatever it takes to get the product in a finished form," prepares the netting to

the specifications of an end user.  (Pettit Dep. Tr. at 21-22, 26-27.)

**Internet's Former Employee, Thomas Brand**

Thomas Brand began working for Conwed Plastics, Internet's key supplier, in 1990.

(Jancik Decl. Ex. 2 ¶ 5.)  In 1996, he joined Internet as a marketing apprentice, and in 1999

became the company's Marketing Manager.  (Burchell Aff. ¶ 21; Frandsen Decl. ¶ 42.)  In

this role, Brand was trusted with all of what Internet refers to as its "confidential data,

including customer names and contacts, customers' product peculiarities and

specifications, purchasing volume, manufacturing and packaging preferences, prices and

margin information, as well as other sensitive customer-specific information."  (Frandsen

Decl. ¶¶ 43-46.)

---

[2]Internet alleges that "Tensar has been trying unsuccessfully to get into the filtration market for 1 ½ to 2 years."  (Mem. in Supp. at 7, 27.)  While Tensar disputes this point and challenges Internet's supporting evidence, it is clear from the record that Tensar desired to expand its presence in the filtration market.

Brand was never asked to sign a non-competition, non-disclosure, non-solicitation, or confidentiality agreement in conjunction with his employment with Internet.  (Jancik Decl. Ex. 2 ¶ 14.)  In 1999, the ownership of Internet changed hands.  (Id. ¶ 13.)  As part of that change in ownership, Brand received an employee handbook and signed an acknowledgment form stating that he had received the handbook.  (Al Decl. Ex. 5.)  The acknowledgment form stated that the handbook "is neither a contract of employment nor a legal document."  (Id.)  The form also stated: "I understand that it is my responsibility to read and comply with the policies contained in this handbook."  (Id.)  The handbook provided that Internet's confidential information included: compensation data, customer lists, customer preferences, financial information, marketing strategies, pending projects and proposals, proprietary production processes, and technological data.  (Frandsen Decl. Ex. 9.)  It also provided that employees "who improperly use or disclose trade secrets or confidential business information will be subject to disciplinary action, up to and including termination of employment."[3]  (Id.)

On July 2, 2004, without any warning, Brand announced that he was terminating his employment with Internet, effective immediately.  (Frandsen Decl. ¶¶ 50-51.)  Later examination of Brand's Internet e-mail account revealed that, while Brand was still

---

[3]Internet submitted a number of excerpts from past versions of its employee handbook in support of this Motion.  It is not clear from its submissions which handbook corresponds to Brand's acknowledgment form, which is dated December 22, 1998.  However, each version of the handbook appears to prohibit the improper use or disclosure of confidential information (with the exception of the handbook-excerpt attached as exhibit 8 to the Frandsen Declaration).  (Frandsen Decl. ¶ 38, Exs. 6, 8, 9, 10, 11, 12.)

employed at Internet, he had been soliciting offers from numerous of Internet's

competitors to explore the possibility of creating his own consulting business regarding the

filtration market.  (See Al Decl. ¶¶ 5-8.)  One of the companies Brand contacted was Hanes

Converting ("Hanes"), which had a close relationship with Tensar.  Initially, Brand was in

contact with John Pettit of Tensar as a sounding board for his conversations with Hanes.

(Pettit Dep. Tr. at 51-52.)  Eventually, however, he began primarily targeting Tensar, rather

than Hanes, as a potential business partner or employer.  (Al Decl. Ex. 10.)

**Brand's Use of Information Regarding the Filtration Market**

In the months preceding his departure from Internet, Brand provided generic

information regarding the filtration market, Internet, and Conwed, to the competing

companies he had contacted regarding potential employment relationships.  (See, e.g., Al

Decl. Exs. 3, 4, 7, 8, 9, 11, 12, 30 (e-mails from Brand to Pettit and others regarding the

filtration market).)  As he engaged in ongoing discussions with these companies, he

provided them with additional detailed information about the filtration market and the

services he could provide as a consultant with inside knowledge of that market.  (Id.)  His

communications with Pettit and others were aimed at demonstrating how he could aid their

entry into that market.  (Id.)

After leaving Internet, Brand formed his own company—Precision Materials, Inc.

("PMI")—and entered into independent contractor or consulting relationships with some of

the companies he had contacted; specifically, he entered into an independent contractor

relationship with Tensar, pursuant to which Tensar agreed to pay him $7,500.00 per month

as a consultant regarding the filtration market.  (Pettit Decl. ¶ 10.)  Under the terms of the

agreement, Brand would provide consulting advice and recommendations for "developing

the market, identifying customers and specific product requirements, and closing sales

opportunities for [Tensar's] products in the filtration market. . . ."  (Al Decl. Ex. 32; Pettit

Decl. ¶ 10.)

Following the execution of the agreement, PMI, Brand's newly formed company,

began acting as a filtration industry marketing consultant for Tensar.  (Pettit Decl. ¶ 11.)  At

the time, Tensar already produced many of the types of products consumed by the filtration

industry, as evidenced by its sale of such products to Internet.  Brand provided advice to

Tensar regarding improving Tensar's products, potential additional product lines, potential

customers and markets, customer service and administrative support issues, pricing, and

general market techniques.[4]  (Jancik Decl. Ex. 2 ¶ 39; Pettit Decl. ¶ 11.)

In his work for Tensar, and in his efforts to obtain bids for Tensar, Brand contacted

approximately twelve or thirteen customers in the filtration market (Jancik Decl. Ex. 2 ¶¶

---

[4]Brand provided Tensar with some of the information contained in a spreadsheet
entitled "Product Development Priorities" which identifies a number of filtration
customers and information regarding the product needs of those customers.  (Id. Ex. 34.)
Internet also relies on a document entitled "Quotation Requirements," which contains
detailed information regarding a number of Internet's filtration customers, along with
detailed information regarding product requirements, pricing, and margins.  (Al Decl. Ex.
23.)  However, this document was produced by Brand in a separate state court litigation
(see infra pp.7-8), and Internet has not presented any evidence to suggest that Tensar ever
received this document.  (Pettit Dep. Tr. at 164-66 (testifying that he was not sure that he
ever saw Exhibit 23, and that Brand handled all of the quotations to customers); Mem. in
Opp'n at 18 n.5.)  Because it is unclear whether Tensar was ever in possession of this
document, its relevance to the instant Motion is minimal.

41, 45-47), all of whom were Internet's customers (Frandsen Decl. ¶ 65).  Tensar, however,

did not have any direct contact with these customers in an attempt to sell Tensar

products—Brand acted as the sole sales contact.  (Pettit Decl. ¶ 11.)  According to Pettit,

he had "no reason to believe that Brand was improperly using information learned during his

employment with Internet or otherwise violating any obligations to Internet in contacting

potential customers for [Tensar]."  (Id.)

To date, Tensar has not sold a single product that Brand attempted to sell on its

behalf, nor has Brand consummated any sale of a Tensar product.  (Id. ¶ 12.)  Brand's

efforts on behalf of Tensar resulted in four bid quotations to potential customers.  (Id.)

Those quotations have since been formally rescinded by Tensar.  (Jancik Decl. Ex. 11.)

**Internet's Action Against Brand**

Internet alleges that the foregoing actions by Brand constituted misappropriation of

its trade secrets.  Internet pursued this claim against Brand in Hennepin County District

Court, and obtained a preliminary injunction on February 2, 2005.  The court enjoined

Brand "from contacting any existing or former customers of Internet and . . . from aiding

and assisting anyone else from doing the same and . . . from using any trade secrets with

respect to furtherance of his own career or any contracts he . . . entered into. . . ."  (Al Decl.

Exs. 60, 37.)  Following mediation, Brand settled with Internet, essentially by agreeing to

make the temporary injunction permanent.  (Al Decl. Ex. 1.)

Since the instant litigation was initiated against Tensar in February 2005, Tensar

terminated its consulting agreement with Brand.  (Jancik Decl. Ex. 10.)  It has also

rescinded the quotations that resulted from Brand's work on its behalf, and informed those

customers that Brand's relationship with Tensar has been formally severed.  (Id. Ex. 11.)  In

March 2005, Tensar directed an information technology specialist to review the computers

and systems belonging to individuals with any connection to Tensar and recover all e-mails,

attachments, documents, and other information that referenced in any manner, Brand,

Brand's company, PMI, or information provided to Tensar from Brand.  (Martin Aff. ¶¶ 2-

8.)  Once this information was recovered, Tensar's computer systems were purged; Tensar

has informed Internet of its actions.  (Id.; Jancik Decl. Ex. 16.)  Tensar has refused,

however, to agree to Internet's requests that it refrain from making any sales in the

filtration market in the future.

**Internet's Motion for a Preliminary Injunction**

On February 4, 2005, Internet initiated this action against Tensar in state court which

Tensar removed to this Court.  Internet filed the instant Motion for a Preliminary Injunction

almost five months later, on July 8, 2005.  In its Motion, Internet seeks a preliminary

injunction pursuant to Minn. Stat. § 325C.02, enjoining Tensar, and its employees, agents,

and collaborators from:

> 1) Disclosing or using any of Internet's confidential information and trade
> secrets obtained through their agent, Thomas Brand;
>
> 2) Retaining any information in its possession received from Brand or
> derived from information received from Brand concerning Internet or its
> customers or products;
>
> 3) Contacting, soliciting, or executing any contracts with Internet's
> customers for filtration products or, in the event any such contracts have

already been executed, taking any further steps to implement or complete any
such contracts; or

4) Selling products developed using Internet's trade secret information.

Defendants and their employees, agents, and collaborators should
specifically be enjoined from contacting, soliciting, executing, or fulfilling
any contracts for filtration products with those companies listed in Exhibits
19, 24, 25, and 39 to the July 8, 2005 Declaration of Marc A. Al.[5]

(Doc. No. 22 (footnote added).)

## Standard of Review

Whether preliminary injunctive relief should be granted depends on an evaluation of

the following four factors: (1) the threat of irreparable harm to the moving party should a

preliminary injunction be denied; (2) the balance between this harm and the harm that

granting the injunction will cause to the other parties litigant; (3) the probability that the

moving party will succeed on the merits; and (4) the public interest.  Dataphase Sys., Inc. v.

CL Sys., Inc., 640 F.2d 109, 113-14 (8th Cir. 1981); see Watkins Inc. v. Lewis, 346 F.3d

841, 844 (8th Cir. 2003).  A preliminary injunction is an extraordinary remedy, and the

party seeking injunctive relief bears the burden of proving all the Dataphase factors.

Watkins, 346 F.3d at 844.

---

[5]Exhibit 19 is a listing of all of the companies contacted by Brand after his
resignation from Internet.  More than 40 companies are listed by name.  Eleven of those
companies are circled, indicating those companies Brand contacted on behalf of Tensar.
(Al. Decl. ¶ 26.)  Internet does not limit its request for injunctive relief to only those
circled companies.  Exhibit 24 is a copy of a quote by Brand on behalf of Tensar to an
Internet customer; Exhibit 25 is a copy of a quote by Brand on behalf of Tensar to another
Internet customer; and Exhibit 39 is a document showing Brand's July 2004 sales calls on
behalf of Tensar.

## Analysis

Internet alleges that it is entitled to a preliminary injunction against Tensar based on its ability to establish all four of the <u>Dataphase</u> factors.  Tensar argues that Internet fails to satisfy any of the <u>Dataphase</u> factors.  The Court will address each factor in turn.

### A.      Irreparable Harm

Internet contends that it will be irreparably harmed if Tensar is not enjoined from pursuing business opportunities in the filtration business.  Tensar responds that Internet fails to establish irreparable harm because Tensar does not possess any of Internet's information (Mem. in Opp'n at 25-26), and Internet's Motion is untimely (<u>id.</u> at 26-27).[6] Thus, according to Tensar, Internet's Motion must fail.

"The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.  Thus to warrant a preliminary injunction, the moving party must demonstrate a sufficient threat of irreparable harm."  <u>Bandag, Inc. v. Jack's Tire & Oil, Inc.</u>, 190 F.3d 924, 926 (8th Cir. 1999) (internal quotations and citations omitted). "Failure to show irreparable harm is an independently sufficient ground upon which to deny [preliminary injunctive relief]."  <u>Watkins Inc</u>, 346 F.3d at 844 (citation omitted).  "[A]n injunction cannot issue based on imagined consequences of an alleged wrong.  Instead, there must be a showing of imminent irreparable injury."  <u>In re Travel Agency Comm'n Antitrust Litig.</u>, 898 F. Supp. 685, 689 (D. Minn. 1995) (citation omitted).  Thus, if Internet

---

[6]Tensar also argues that an injunction is not appropriate because Internet has an adequate remedy at law.  (<u>Id.</u> at 27-28.)

10

fails to prove irreparable harm, its request for a preliminary injunction must be denied without regard to the remaining Dataphase factors.

Internet claims that it is likely to suffer imminent irreparable injury from the fact that Tensar possesses Internet's trade secrets and is poised to use those trade secrets to solicit business from Internet's customers.  To this claim, Tensar responds that there "is no showing that such a harm exists or is even threatened."  (Mem. in Opp'n at 25.)  According to Tensar, even if it had received confidential information or trade secrets, "the facts establish that [Tensar] has not used and does not continue to possess such information, having effectively divested itself of all information received from Brand shortly after Internet obtained the injunction against Brand."  (Id.)

The Court agrees.  "[E]stablishing a risk of irreparable harm is not enough.  A plaintiff has the burden of proving a clear showing of immediate irreparable injury."  ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 225 (3d Cir. 1987) (emphasis added) (internal quotation omitted).  Here, Tensar argues that "[o]nly after Internet obtained a permanent injunction against Brand and those acting in concert with him did Tensar retract its quotes and temporarily freeze its marketing activities."  (Reply Mem. at 7.)  This does not, however, show that Tensar is capable of inflicting "immediate irreparable injury" on Internet, even if it were desirous of such a course of action.  ECRI, 809 F.2d at 225.

Internet has not established that, absent an injunction, Tensar will be poised to inflict injury upon it that is "both certain and great; [the injury] must be actual and not theoretical."  Packard Elevator v. I.C.C., 782 F.2d 112, 115 (8th Cir. 1986) (internal quotation omitted).

11

Tensar has severed its business relationship with Brand, and retracted all quotations Brand provided on behalf of Tensar to potential customers.  Further, Internet has not produced convincing evidence that Tensar made any actual progress in its effort to enter the filtration market, even with the assistance of Brand.[7]  While Internet may have had reason to be threatened by the business relationship that developed between Brand and Tensar, the Court cannot enjoin Tensar from ever marketing to or attempting to enter the filtration market based on speculative allegations that Internet will be injured at some time in the future because of information Brand provided to Tensar, which undisputedly has not resulted in any sales to date.

In addition, Tensar appears to have purged its computer files of information provided by or relating to Brand, and the Court has not been directed to any evidence to suggest that individuals at Tensar committed to memory any information Brand provided.   In fact, the testimony on point from Tensar's Pettit, indicates that any specific customer information provided by Brand was not the focus of much attention from Pettit.  (See Pettit Dep. Tr. at 169 (discussing a document developed by Brand, entitled "Quotation Requirements," which

---

[7] For example, Pettit testified to the following regarding a business development idea suggested by Brand:

Q: Did that [idea] ever go forward?
A: No.
Q: In fact, it hasn't gone forward because you haven't made any sales to [the potential customer]?
A: Correct.
Q: Okay.  Have you discussed [the idea] with them?
A: No.  I have not."

(Pettit Dep. Tr. at 172)

contained customer names and recommended pricing information, and stating that "[w]hen I would receive this type of information I wouldn't do a whole lot with it . . . a lot of this type of information and stuff like that . . . it just sat in the file.  I didn't really do that much with it.")

Internet argues that it faces irreparable harm based on the fact that Tensar "<u>acquired</u> trade secret information and <u>used</u> it to modify nine select products to make them suitable for Internet's niche of the filtration market."  (Reply Mem. at 7 (emphasis in original).) However, Internet's evidence on this point is less than compelling; while there is evidence that some of Tensar's existing products would need modest modifications in order to be viable in the filtration market, there is nothing to suggest that Tensar has implemented those modifications such that its products would be acceptable to customers in that market.[8]

---

[8]Internet's most probative evidence on this point is the following testimony from Pettit:

> Q: Now, having established these development priorities did you go ahead and start doing this development in the priority order here?
> A: Yes.
> Q: And has the development of each of these products been completed to your satisfaction?
> A: <u>To my satisfaction, no.</u>
> Q: No?  Are there some that have and some that haven't?
> A: Yes.
> Q: Which ones have?
> A: I don't know exactly.  I don't know exactly.
> Q: Well, have sort of half of them been completed, a third of them, just give me your best—
> A: I would say probably better than half.
> Q: <u>And have these products been qualified by the customers so if the</u>

Furthermore, this action will be ongoing regardless of the disposition of the instant

Motion, and Internet has not presented any evidence to suggest that Tensar will commence

actions that it voluntarily ceased at the inception of this action while this litigation is

pending.  It bears repeating that the Court cannot impose the "drastic and extraordinary

remedy" of preliminary injunctive relief, Intel Corp. v. ULSI Sys. Tech., Inc., 995 F.2d

1566, 1568 (Fed. Cir. 1993), without "a clear showing of immediate irreparable injury,"

ECRI, 809 F.2d at 225 (internal quotation omitted).

Second, Tensar points to the delay in bringing Internet's Motion for injunctive relief

as an indication of its inability to show irreparable harm.  It argues that "Internet knew of

Brand's activities as early as October 2004 and met with [Tensar] in the fall of 2004 to

address its concerns about Brand's relationship with [Tensar]."  (Mem. in Opp'n at 26.)

---

> customers were to place an order you would be able to provide these
> products?
> A: No.
> Q: No?
> A: No.
> Q: So, have any of them been?
> A: Sent to customers?
> Q: Yeah.
> A: No.

(Pettit Dep. Tr. at 160-61 (emphasis added).)  This testimony highlights the uncertainty and
doubtfulness surrounding Tensar's ability to enter into the filtration market immediately.
Further, and more fundamentally, Internet has not identified specific products that have
been successfully modified with the use of information from Brand, much less with the use
of specific information alleged to be Internet's trade secrets.  (See, e.g., Pettit Dep. Tr. at
109-110; 153-55; 157-59.)  See also Porous Media Corp. v. Midland Brake Inc., 187
F.R.D. 598, 600 (D. Minn. 1999) ("Failure to identify the trade secrets with sufficient
specificity renders the Court powerless to enforce any trade secret claim." (citing AMP,
Inc. v. Fleischhacker, 823 F.2d 1199, 1203 (7th Cir. 1987)).

Internet commenced this action in February 2005 and did not file the instant Motion for

preliminary injunctive relief until July 2005[9], securing a hearing date for late August

2005[10].

 While the Court does not consider such a delay dispositive of Internet's showing (or

lack thereof) of irreparable injury, it does weigh against a finding on this factor for Internet.

This determination is bolstered by Internet's failure to present <u>any</u> evidence that Tensar has

made movements toward capitalizing on its former relationship with Brand since this

litigation was commenced in February 2005.  Internet does not argue that it has obtained

new evidence or newly discovered justifications for pursuing preliminary injunctive relief.

 Accordingly, the Court determines that Internet has failed to establish that it will

suffer immediate irreparable injury in the absence of a preliminary injunction, and this

factor weighs heavily against issuing an injunction at this stage of the litigation.  While the

Court notes that once it "determines that the movant has failed to show irreparable harm

absent an injunction, the inquiry is finished and the denial of the injunctive request is

warranted," <u>Gelco Corp. v. Coniston Partners</u>, 811 F.2d 414, 420 (8th Cir. 1987) (citations

omitted), it will briefly address the remaining <u>Dataphase</u> factors.

---

[9]Internet filed a Notice of Hearing on Motion regarding the instant Motion on June 17, 2005.  (Doc. No. 20.)  The instant Motion and supporting papers followed on July 8, 2005.  (Doc. Nos. 23-41.)

[10]As Internet points out, the hearing date for the instant Motion was continued for approximately one month, first at Tensar's request, and then due to the Court's scheduling conflicts.  The Court does not consider these delays pertinent to Internet's showing of imminent irreparable harm.

**B.**     **Balance of Harm**

Under the second factor in the <u>Dataphase</u> analysis, the Court considers whether the harm likely imposed on the nonmoving party by issuing the injunction outweighs the harm imposed on the moving party by denying the injunction.  "The balance of harm must tip decidedly toward the plaintiffs to justify issuing a preliminary injunction."  <u>Marigold Foods, Inc. v. Redalen</u>, 809 F. Supp. 714, 720 (D. Minn. 1992).

Internet argues "[t]here is no harm to Tensar from forbidding it to use Internet's trade secrets to illegally misappropriate Internet's customers."  (Mem. in Supp. at 32.)  It contends that Tensar's refusal to abstain from ever doing business with Internet's filtration customers tips the balance of harm in its favor.  Tensar responds that it would suffer harm if "disallow[ed] . . . to do business in a market where it previously did business, with manufacturing technologies it has available to it . . ., and with products it has always produced or can easily produce vastly outweighs the harm to Internet if another competitor enters the market."  (Mem. in Opp'n at 39.)

The injunctive relief sought by Internet is broad and far-reaching.  Internet seeks to enjoin Tensar indefinitely from "<u>contacting, soliciting, executing, or fulfilling any contracts for filtration productions</u>" with more than 40 companies, because those companies are Internet's customers.  (Doc. No. 22 (emphasis added).)  The Court determines that the harm suffered by Tensar if such an overly broad injunction issued—effectively preventing Tensar from competing with Internet in the filtration market—outweighs any harm that Internet may suffer without an injunction.  Cf. <u>Equus</u>

Computer Sys., Inc. v. Northern Computer Sys., Inc., 2002 WL 1634334, at *4 (D. Minn.

July 22, 2002) (holding that the balance of harms did not prevent an injunction where the

defendant company "would not be entirely precluded from competing in the . . . market").

Furthermore, Internet has not even attempted to show that Tensar has received detailed

information about or has attempted in any way to pursue business with all of the 40-plus

companies it seeks to enjoin Tensar from ever contacting.  Thus, the Court determines that

the balance of harms factor also weighs against enjoining Tensar at this time.

## C.      Likelihood of Success on the Merits

In applying the third factor of the Dataphase analysis, the Court does not consider

whether the movant will ultimately prevail on the merits, and must "avoid deciding with any

degree of certainty who will succeed or not succeed." Glenwood Bridge v. City of

Minneapolis, 940 F.2d 367, 371 (8th Cir. 1991) (internal quotation omitted).  Rather, the

Court must "flexibly weigh the case's particular circumstances to determine 'whether the

balance of equities so favors the movant that justice requires the court to intervene to

preserve the status quo until the merits are determined.'" Calvin Klein Cosmetics Corp. v.

Lenox Lab., Inc., 815 F.2d 500, 503 (8th Cir. 1987) (quoting Dataphase, 640 F.2d at 113).

In this, as with the other Dataphase factors, the movant bears the "compete burden." Gelco

Corp., 811 F.2d at 418.

Internet asserts that it will succeed on its claim that Tensar has misappropriated its

trade secrets in violation of the Minnesota Trade Secrets Act, Minn. Stat. § 325C because

Tensar "knew or should have known Brand was providing it with Internet's valuable trade

secrets." (Mem. in Supp. at 30.) It argues this based in part on Tensar's treatment of its own business information, the "circumstances under which Tensar received the information,"[11] and the type of information disclosed.[12] (Id.)

Tensar responds that Internet's claims against it (as opposed to its claims against Brand) fail for several reasons. It argues that Internet has failed to identify the trade secrets allegedly misappropriated by Tensar with sufficient specificity (Mem. in Opp'n at 30-33), that customer identities are not a trade secret (id. at 33-35), that pricing information is not a trade secret (id. at 35-36), and that Internet failed to preserve the confidentiality of the information (id. at 36-38).

Minnesota's Trade Secrets Act requires the party seeking protection to show both the existence and the misappropriation of a trade secret. Electro-Craft Corp. v. Controlled Motion, Inc., 332 N.W.2d 890, 897 (Minn. 1983). To establish that a particular item is a

---

[11]In arguing that the circumstances put Tensar on alert, Internet refers to the fact that Brand was in discussions with Tensar while he was still employed at Internet, and that he withheld certain information regarding customers' identities and product volumes and specifications with critical details missing, only filling in the blanks once he was hired by Tensar as an independent contractor. (Mem. in Supp. at 30.) However, the evidence also suggests that Tensar did not perceive this behavior as unlawful, but instead as the result of Brand attempting to sell himself. Thus, Brand withheld certain information until he was hired by respective companies for his expertise and consulting services.

[12]Tensar has moved to strike the declaration of Robert McIlvaine, submitted by Internet in support of its Reply Memorandum on the issue of whether its customer and other information constitutes trade secrets, on the grounds that it is "both untimely, and unnecessary to address factual claims of Defendants that were not reasonably anticipated," under Rule 7.1(a) of the Local Rules of the United States District Court for the District of Minnesota. (Doc. No. 79.) Because the Court determines that Internet is not entitled to preliminary injunctive relief regardless of the McIlvaine Declaration, the Motion to Strike (Doc. No. 79) is DENIED as moot.

"trade secret" under the Act, Internet bears the burden of proving that (1) the information was not generally known or readily ascertainable, (2) the information derived independent economic value from secrecy, and (3) it made reasonable efforts to maintain the information's secrecy.[13]   See NewLeaf Designs, LLC v. BestBins Corp., 168 F. Supp. 2d 1039, 1043 (D. Minn. 2001); Lexis-Nexis v. Beer, 41 F. Supp. 2d 950, 958 (D. Minn. 1999).

The Act further provides that a party receiving trade secrets is liable for misappropriation of trade secrets if "[a]t the time of disclosure or use, [it] knew or had reason to know that the discloser's or user's knowledge of the trade secret was . . . derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use."  Minn. Stat. § 325C.01, subd. 3; see also Scott Equipment Co. v. Stedman Machine Co., 2003 WL 21804868 at *3 (D. Minn. July 31, 2003).

---

[13]   The Act defines a "trade secret" as

information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

     (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

     (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Minn. Stat. § 325C.01, subd. 5.

Internet has produced evidence to support its contention that the identity of its

customers, together with pricing information and product specifications for those

particular customers are trade secrets.[14]  Further, there is evidence that Tensar was

informed of the identities of some of Internet's filtration customers, and the product needs

of those customers.  However, the Court notes that, ultimately, Internet will have a high

burden to overcome on this point, as customer lists, even with specific information about

those customers attached to them, are generally not considered to rise to the level of a

trade secret under Minnesota law.  See Fox Sports Net North, LLC v. Minnesota Twins

P'ship, 319 F.3d 329, 336 (8th Cir. 2003) ("[K]nowledge of industry contact people does

not rise to the level of a trade secret because this type of unprotected information is readily

attainable within a trade."); NewLeaf Designs, LLC, 168 F. Supp. 2d 1039 (finding lists

with detailed information about customers were not trade secrets); Signergy Sign Group,

Inc. v. Adam, 2004 WL 2711312, at *2 (Minn. Ct. App. Nov. 30, 2004).  But see Surgidev

Corp. v. Eye Tech., Inc., 648 F. Supp. 661 (D. Minn. 1986), aff'd 828 F.2d 452 (8th Cir.

1987) (finding that some information about high volume customers was trade secret

information).

---

[14]Internet has submitted numerous affidavits in support of its position that the
company's customer identities, pricing information, and product specification information,
(1) are not generally known or readily ascertainable, (2) derive independent economic value
from secrecy, and (3) that Internet makes reasonable efforts to maintain the information's
secrecy.  (See Burchell Decl.; Frandsen Decl.; Hopkins Decl.; Katusky Decl.; McIlvaine
Decl.; Richardson Decl.; Rog Decl.)

Internet's showing regarding the information Brand is alleged to have taken from the company does not end the inquiry.  As discussed above, in order to show a likelihood of success on the merits of its claims of trade secret misappropriation against <u>Tensar</u>, Internet must show that <u>Tensar</u> knew or had reason to know that Brand's consulting services involved the use of Internet's trade secrets.  <u>See, e.g.</u>, <u>Scott Equip. Co.</u>, 2003 WL 21804868, at *3 (finding trade secret misappropriation where company was on notice that information provided by employees contained former employer's trade secrets).

It is not clear whether Internet will prevail on its showing with respect to Tensar's knowledge.  First, assuming the information at issue constitutes Internet's trade secrets, it is unclear precisely what trade secrets Tensar currently possesses or whether Tensar knew it was benefitting from misappropriated trade secrets at the time it used them.  Internet alleges that Brand "provided Internet's information to allow Tensar to modify existing products into desirable—better quality—products to be able to market to the filtration market."  (Reply Mem. at 2.)  However, as discussed above (<u>see</u> supra pp.12-14), Internet does not present evidence of which products Tensar actually modified, or whether Tensar was aware that any modifications were explicitly based on specific information from Brand regarding Internet's filtration customers.  Thus, it is unclear whether Internet will be able to show that Tensar knew Brand's consultation services involved the use of misappropriated trade secrets.

This conclusion is bolstered by the fact that Brand was not under any contractual obligations to Internet—he never entered into a non-competition, non-solicitation, or non-

disclosure/confidentiality agreement with Internet.  Thus, one potential warning signal to

Tensar regarding its relationship with Brand was not present.[15]  And, it bears noting, that

Tensar and Internet had never executed confidentiality or non-disclosure agreements in

conjunction with their business dealings in the past.  See International Bus. Mach. Corp. v.

Seagate Tech., Inc., 941 F. Supp. 98, 101 (D. Minn. 1992) ("A claim of trade secret

misappropriation should not act as an *ex post facto* covenant not to compete." (citation

omitted)).

      Finally, Internet's request for injunctive relief lacks the required specificity

regarding which trade secrets it alleges Tensar possesses, nor is the relief it seeks tailored

to prevent Tensar's use of specific information.  Tensar cannot be enjoined from using

information it did not obtain from Brand, or from competing with information that it did

not know or have reason to know was Internet's trade secret information.  See id. at 100-

101 ("[A]n injunction is inappropriate if plaintiff fails to identify specific trade secrets and

instead produces long lists of general areas of information which contain unidentified trade

secrets.").  Therefore, the Court determines that Internet's showing on this factor is not

sufficient to tip the balance of the factors toward issuing injunctive relief.[16]

_____

[15]Internet relies on Surgidev Corporation, 648 F. Supp. 661, as support for its position that its customer information constitutes trade secrets.  (See Mem. in Supp. at 26-29.)  It is worth noting, however, that the court in Surgidev found it significant that the employees and information at issue in that case were subject to non-disclosure, non-competition, and non-solicitation agreements.  See id., 648 F. Supp. at 682-83.

[16]The Court notes that the Pretrial Scheduling Order provides that this action will not be deemed ready for trial until November 2006.  (Doc. No. 19.)  Either party, of course, is free to seek modification of the Pretrial Scheduling Order to advance the case for an

**D.       The Public Interest**

The final Dataphase factor considers the public interest in the issuance or denial of

the requested injunction.  Here, public policy favors denial of Internet's Motion.  Internet

has already obtained an injunction against Brand; thus, any unfair competition that was being

perpetrated by Brand has been enjoined.  Tensar has severed its relationship with Brand, and

purged its computer records of information he provided; thus, even assuming that Tensar

received trade secret information from Brand, there is no evidence that Tensar has

committed that information to memory at this stage in the litigation.  Absent clear evidence

of wrongdoing on the part of Tensar, public policy does not support an order enjoining it

from ever competing with Internet in the filtration market, and in effect allowing Internet to

operate without competition from at least one potential competitor.  See, e.g., Benfield,

Inc. v. Moline, 351 F. Supp. 2d 911, 919 (D. Minn. 2004) (noting that public interest favors

competition).  Accordingly, having considered all of the Dataphase factors, the Court

determines that, at this stage in the proceedings, the equities weigh in favor of denying

Internet's Motion for broad injunctive relief against Tensar.

**Conclusion**

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS**

**ORDERED** that Internet's Motion for Preliminary Injunction (Doc. No. 22) is **DENIED**.[17]

---

earlier trial.

[17]In accordance with Federal Rule of Civil Procedure 52(a), the foregoing
Memorandum Opinion and Order are the Court's findings of fact and conclusions of law
that constitute the grounds of its action.

Dated: October 3, 2005                              s/Richard H. Kyle
                                                    RICHARD H. KYLE
                                                    United States District Judge